## IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 20, 2003 Session

## LOUIS FEDERICO v. ALADDIN INDUSTRIES, LLC

**Appeal from the Chancery Court for Davidson County**
**No. 01-1774-I     Irvin H. Kilcrease, Jr., Chancellor**

———————————

**No. M2002-02351-COA-R3-CV - Filed June 27, 2003**

———————————

Louis Federico ("Plaintiff") began working for Aladdin Industries, LLC ("Aladdin") after they agreed in writing to his terms of employment. Among other things, they agreed Plaintiff would receive an annual salary of $180,000, plus a guaranteed bonus in the first year of $72,000. They also agreed to a separation package which provided that should Plaintiff lose his job other than through his own volition, he would receive "12 months' salary, prorated bonus and outplacement services." Plaintiff's position was eliminated before his first year of employment was completed. Plaintiff filed this lawsuit claiming the language in the separation package entitled him to a "separation bonus" of $72,000 in addition to the guaranteed first year bonus in the same amount. Aladdin disagreed, arguing Plaintiff was not entitled to any additional bonus over and above the guaranteed first year bonus because he never began working a second year. The Trial Court agreed with Aladdin and dismissed Plaintiff's complaint. Plaintiff appeals, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Chancery Court Affirmed; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

H. Rowan Leathers, III, Douglas B. Janney, III, Nashville, Tennessee, for the Appellant Louis J. Federico.

William N. Ozier, Nashville, Tennessee, for the Appellee Aladdin Industries, LLC.

# OPINION

## Background

After losing his job in New York as a result of a corporate reorganization, Plaintiff entered into negotiations with Aladdin's CEO, Ari Chaney ("Chaney"), regarding his potential employment as an Executive Vice President of Marketing and Sales in Nashville. These negotiations eventually culminated in an offer of employment dated December 20, 1999 ("the Contract"). This document provides, in pertinent part, as follows:

> It is with a great deal of pleasure that I offer to you employment on behalf of Aladdin Industries, LLC, effective January 5, 2000.
>
> | Position: | **Executive V.P., Marketing and Sales** |
> |---|---|
> | Salary: | **$180,000 per annum** or $6,923.08 per bi-weekly pay period |
>
> In addition to your base salary, you will be given a first year guaranteed bonus of $72,000.…
>
> In the event you should leave Aladdin for reasons other than through your own volition, you will receive 12 months' salary, prorated bonus and outplacement services.…

Chaney signed the Contract for Aladdin. Plaintiff signed the Contract accepting its terms, moved from New York to Nashville, and began working for Aladdin on January 5, 2000. Plaintiff's employment with Aladdin was terminated less than a year later on December 1, 2000.

Pursuant to the terms of the Contract, Plaintiff received $180,000 as an additional twelve months of salary after he was terminated. Plaintiff also received the guaranteed first year bonus of $72,000 and outplacement services. However, Plaintiff claimed he was entitled to another $72,000 bonus pursuant to the terms of the Contract. Aladdin disagreed and refused to pay any additional compensation.

Plaintiff filed suit on June 4, 2001, claiming Aladdin refused to pay him the separation bonus in accordance with the terms of the Contract. In his complaint, Plaintiff detailed discussions he had with Chaney regarding separation benefits. According to Plaintiff, "Chaney informed [Plaintiff] that he would be provided a 'bonus' as part of his separation package in the event Aladdin terminated his employment. Chaney further represented that this 'bonus' would be in addition to any other bonus payments, guaranteed or otherwise which [Plaintiff] might receive as part of his regular compensation." Plaintiff claimed Aladdin breached its employment contract with him and also violated Tenn. Code. Ann. § 50-1-102 through false and deceptive representations

concerning separation benefits. Plaintiff sought damages in the amount of $72,000, plus attorney fees and costs.

Aladdin answered the complaint, generally denying the pertinent allegations contained in it. Aladdin admitted Plaintiff was advised he would receive a "bonus" as part of his separation package, but denied Chaney agreed to any bonus over and above what was contained in the written Contract which Plaintiff already had received.

A non-jury trial was held on July 24, 2002. Plaintiff testified he earned a BBA degree from Adelphi University and an MBA degree in marketing and international business from New York University. Prior to working for Aladdin, Plaintiff worked for Delonghi America in New York as an Executive Vice-President. Plaintiff's position with Delonghi America was eliminated as part of a corporate reorganization. Soon thereafter, Plaintiff learned about a potential employment position with Aladdin through Hamilton Partners, a recruiting firm based in Connecticut. After Hamilton Partners shared Plaintiff's background information with Aladdin, Plaintiff contacted Aladdin's Vice President of Human Resources, Lillian Jenkins ("Jenkins"), and made arrangements to visit Nashville. On November 19, 1999, Plaintiff went to Nashville and met first with Jenkins and then with Chaney. The initial meeting focused on Aladdin and the company's future goals, etc. This meeting apparently went well, and Plaintiff returned to Nashville on December 10, 1999, for a second meeting. During this trip to Nashville, Plaintiff met with several Aladdin senior executives.

Plaintiff returned to New York and began having telephone conversations with Chaney about compensation, benefits, etc. As pertinent to this appeal, Plaintiff testified he and Chaney agreed to a base salary of $180,000. According to Plaintiff, the year 2000 was going to be a "rebuilding" year for Aladdin, and he knew the first year would be difficult as far as product volume was concerned. Because of this, Plaintiff believed "a guaranteed bonus for year one would be appropriate since it would be quite difficult to have any stellar year in the first year of coming to Aladdin." Plaintiff and Chaney agreed to a guaranteed bonus of $72,000 for the first year. Plaintiff and Chaney discussed "separation benefits" during their second telephone call. It was agreed that if Plaintiff's employment was terminated other than through his own volition, his salary would continue for one-year and he would receive outplacement services. Plaintiff also informed Chaney he wanted the bonus to be part of a separation package. According to Plaintiff, Chaney stated Plaintiff would receive "a bonus comparable to my prior year bonus, whenever that occurred." After an agreement was reached, Plaintiff received the Contract via overnight delivery. Plaintiff agreed with the terms of the Contract, signed it, and returned it to Chaney.

When Plaintiff was asked for his interpretation of the term "prorated bonus" contained in the Contract as it pertained to separation benefits, Plaintiff stated he and Chaney had "discussed a bonus that would be equal to last year. So in reading prorated, it just seemed to me that was the word that applied to it being compared to last year." In other words, it referred to "the agreed upon separation bonus of 72,000 …." Plaintiff testified the inclusion of the $72,000 bonus

as part of a separation package was part of what induced him to take the job with Aladdin over other potential employment opportunities he had at that time.[1]

On cross-examination, Plaintiff admitted he was familiar with what the term "prorated" meant in real estate matters, and that it involved "some apportionment." He read the term "prorated" which was contained in the Contract, but never asked Chaney or anyone else at Aladdin what that term meant. Plaintiff claimed he did not seek clarification of what "prorated" meant because it was "crystal clear" to him what it meant. Plaintiff conceded he was not claiming Chaney had misrepresented anything to him. Plaintiff also admitted Chaney was the only representative of Aladdin with whom he discussed the terms of his employment. Plaintiff acknowledged that a "potential interpretation" of the language at issue would be that if he did not work any time in a second year of employment, he would not receive a bonus.

The next witness was Chaney, who testified he became Aladdin's President and CEO in May of 1999, and he worked in that capacity for 18 months. At the time of trial, Chaney resided in Florida and was not employed. As pertinent to this appeal, Chaney claimed he and Plaintiff discussed the risks associated with Plaintiff's accepting employment with Aladdin given the company's financial situation at that time. Chaney stated he and Plaintiff agreed that if Plaintiff was terminated other than for his own volition, he would receive a severance package consisting of one-year base salary, outplacement services, and a bonus payment "at whatever . . . his prior bonus payment had been."

Chaney was questioned about the severance package for Jeffrey Hopmayer ("Hopmayer"), another Aladdin executive who was hired the same day as Plaintiff. According to Chaney, Plaintiff and Hopmayer had identical severance packages except for the amount of their base salary and guaranteed first year bonus. The offer of employment sent to Hopmayer, however, did not contain the term "prorated" where it discussed a bonus upon separation. More specifically, Hopmayer's offer of employment provided that if separation not of his own volition happened, he would receive "12 months salary and bonus." When questioned about this difference in the separation packages, Chaney testified he did not notice the word "prorated" in Plaintiff's Contract and did not know how that word came to be included in the Contract. Chaney claimed the use of the word "prorated" in Plaintiff's Contract did not accurately reflect what they had agreed upon.

On cross-examination, Chaney admitted he too lost his job with Aladdin and was involved in litigation against the company. Chaney's lawsuit was for defamation of character. Plaintiff paid Chaney's expenses to travel from Florida to Nashville for the trial. Chaney voluntarily appeared at trial and was not under subpoena. Chaney could not recall who typed Plaintiff's offer of employment on his behalf, but he admitted whoever did prepare that document relied upon information he (i.e., Chaney) provided. Chaney did not know where the person who prepared the

---

[1] There were several other items of compensation or benefits contained in the Contract, such as relocation expenses, vacation, etc. We have discussed only those portions of the Contract which are relevant to this appeal.

letter would have "gotten the prorated bonus" language if it did not come from him. Chaney testified he understood what "prorated" meant with regard to real estate. According to Chaney:

> [I]t means an apportionment … [I]f, for example, you live in a house for part of a month or part of a year, you would pay the … percentage of the time that you lived there, either in rent or taxes, if there was a prorated agreement.

Notwithstanding this testimony, when asked if "prorated" in the context of the bonus meant there would be an apportionment, Chaney stated: "It does not. To me it's nonsequitur. I don't understand it in this context." Chaney then admitted that in his pre-trial deposition, he agreed the term "prorated" as used in Plaintiff's Contract would at least imply an apportionment of the bonus. When Plaintiff's employment was terminated, Chaney was no longer employed by Aladdin. Chaney has a Bachelor of Science degree in engineering from the Worster Polytechnic Institute and a Masters in Business Administration from the University of Chicago.

Plaintiff concluded his case in chief by reading into the record portions of Jenkins' pre-trial deposition. In her deposition, Jenkins testified that she was the Vice President of Human Resources at the relevant time. Jenkins testified she prepared the initial draft of the Contract utilizing boilerplate language and adding additional information provided by Chaney. Chaney then reviewed the Contract and made changes. Jenkins testified the entire portion addressing separation benefits was added by Chaney after she presented him with the initial draft.

Aladdin called Jenkins as its first and only witness. Jenkins testified when she added the words "prorated bonus" to the Contract, she was using Chaney's own words and she never would have put the word "prorated" in there on her own. Jenkins testified she determined how to pay Plaintiff's separation benefits based on the terms of the Contract. According to Jenkins, Plaintiff was not entitled to any prorated bonus since he never completed his first full year. Plaintiff was, however, paid the full first year bonus of $72,000. Jenkins further stated that the language used in Hopmayer's offer of employment pertaining to Hopmayer's separation benefits also was provided by Chaney.

On August 15, 2002, the Trial Court issued a memorandum opinion wherein it found the language of the Contract to be clear and unambiguous, and thus valid and binding on the parties. The Trial Court then stated:

> Plaintiff would only be entitled to a "prorated bonus," if he had worked a portion of the following year 2001. He did not work for Aladdin in the year 2001.
>
> Plaintiff failed to adequately prove that he is entitled to a severance bonus of $72,000, in addition to the first year's guaranteed bonus paid to him by Aladdin.

As to Plaintiff's claim that Aladdin violated Tenn. Code Ann. § 50-1-102, the Trial Court stated there was "no creditable evidence" that Aladdin made any misrepresentations. A final order adopting the findings of fact and conclusions of law set forth in the memorandum opinion was entered on September 3, 2002, thereby dismissing the complaint.

Plaintiff appeals, arguing the Trial Court erred when it concluded he was not entitled to an additional separation bonus of $72,000.[2] Aladdin claims on appeal that, while the Trial Court reached the correct result, testimony by Plaintiff and Chaney as to what they intended the offer of employment to mean was inadmissible pursuant to the parol evidence rule.

## Discussion

The factual findings of a trial court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002)(citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.*, 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.*, 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am. Jur. 2d, *Contracts*, § 245).

This Court's initial task in construing the contract at issue, here the offer of employment, is to determine whether the language of the contract is ambiguous. *Planters Gin Co.*, 78 S.W.3d at 890. If the language is clear and unambiguous, the literal meaning of the language controls the outcome of the dispute. *Id.* A contract is ambiguous only when its meaning is uncertain and may *fairly* be understood in more than one way. *Id.* (emphasis added). If the contract is found to be ambiguous, we then apply established rules of construction to determine the intent of the

---

[2] Plaintiff does not appeal the dismissal of his claim brought pursuant to Tenn. Code Ann. § 50-1-102.

parties. *Id.* Only if ambiguity remains after applying the pertinent rules of construction does the legal meaning of the contract become a question of fact. *Id.*

Black's Law Dictionary (7th ed. 1999) at 1236 defines prorate as: "To divide, assess, or distribute proportionately." The Oxford American College Dictionary at 1089 (2002) defines prorate as to: "allocate, distribute, or assess pro rata," and defines pro rata as "proportionally." We believe the Trial Court was correct when it concluded the language in the Contract is clear and unambiguous. Notwithstanding the testimony of Plaintiff and Chaney as to what they claim they really intended, we presume the intent of the parties to this Contract to be that which was "specifically expressed in the body of the contract." *Planters Gin Co.*, 78 S.W.3d at 890. The relevant language provides:

> In the event you should leave Aladdin for reasons other than through your own volition, you will receive 12 months' salary, prorated bonus and outplacement services.…

Based upon the usual, natural, and ordinary meaning of the Contract language, we do not believe this Contract can fairly be read to mean Plaintiff would receive a "separation bonus" of $72,000 for a year in which he never worked. The only fair interpretation of this language is that should Plaintiff work a portion of a particular year and then lose his job other than through his own volition, he would receive a pro rata bonus based on the percentage of the final year that he worked. For example, if Plaintiff worked six months, he would receive 50% of the annual bonus. In no way can this language fairly be read to guarantee Plaintiff, after termination, a full bonus for a year in which he never worked. If that is what the parties had intended, then they easily could have conveyed this intent utilizing language similar to that they actually did use when guaranteeing Plaintiff a first year bonus of $72,000. We believe the contractual language at issue is unambiguous and susceptible only to one fair interpretation, and that interpretation is the one made by the Trial Court.

Finally, Aladdin argues the testimony of Plaintiff and Chase with regard to what they intended the Contract to say or mean was inadmissible pursuant to the parol evidence rule because this testimony directly contradicted what the Contract actually said. Because of the ultimate conclusion reached by the Trial Court, a conclusion which we affirm, this issue is moot, and we pretermit same.

**Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for further proceedings as necessary, if any, consistent with this Opinion, and for collection of the costs below. Costs on appeal are assessed against the Appellant, Louis Federico, and his surety.

_____
D. MICHAEL SWINEY, JUDGE